No. 87-61

IN THE SUPREME COURT OF THE STATE OF MONTANA

1987

GARY A. LARSON,

Claimant and Respondent,

-vs-

SQUIRE SHOPS, INC.,

Employer,

and

INDUSTRIAL INDEMNITY COMPANY,

Defendant and Appellant.

APPEAL FROM: The Workers' Compensation Court, The Honorable
Timothy Reardon, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Marra, Wenz, Johnson & Hopkins; David E. Bauer,
Great Falls, Montana

For Respondent:

Milodragovich, Dale & Dye; Lon J. Dale, Missoula,
Montana

Submitted on Briefs: Aug. 13, 1987

Decided: September 15, 1987

Filed: SEP 15 1987

*Ethel M. Harrison*

Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This appeal arises from a final judgment entered by the Workers' Compensation Court of the State of Montana. Both parties appeal an award of domiciliary care. We return this cause to the Workers' Compensation Court to conform with our opinion.

This appeal concerns an award of domiciliary care issued by the Workers' Compensation Court (WCC) to the claimant, Gary Larson. Gary is a twenty-seven year old married male with two step children. He was injured in a February 1983 automobile accident while in the course and scope of his employment as an assistant manager for the Squire Shop, a Missoula retail clothing store. As a result of the accident, Gary suffered a traumatic blow to the head which, in conjunction with a resulting subdural hematoma, caused permanent brain injury. His resultant disabilities render Gary permanently disabled. Industrial Indemnity Company, workmen's compensation insurer for the Squire Shop, agrees that Gary is permanently totally disabled.

It is agreed on all sides that Gary's injuries are serious. He continues to experience disabilities of memory, thinking, motivation and, at times, vision. Significantly, Gary also suffers emotional instability or difficulty in maintaining emotional control. Because of these disabilities, Gary has experienced difficulty in handling everyday situations and has required some supervision.

Since his release from the hospital on March 3, 1983, Gary has resided with his family at their residence in Clinton, Montana. Since that date, Gary's wife, Candice, has taken over the primary care of Gary. The primary issue upon appeal is whether, under the workers' compensation laws of

this state, Industrial Indemnity is obligated to pay for the services provided by Candice. For the sake of consistency, we will refer to Candice's services as domiciliary care.

This case was first presented to the WCC in May 1985. Though this first hearing concerned issues unrelated to this appeal, it was at this juncture that the WCC raised the issue of domiciliary care. In its findings and conclusions dated August 22, 1985, the WCC noted that Candice's domiciliary care might be compensable and instructed the parties to brief the issue.

On November 4, 1985, the WCC entered its judgment on the issue of domiciliary care. Of primary significance was the court's finding that Gary has required twenty-four hour a day care since his release from the hospital. The court further found that Candice had been providing this around the clock care and that under the laws of this state, Industrial Indemnity was obligated to pay for Candice's domiciliary care. Based on testimony, the WCC found that a reasonable rate of compensation for this care was $7.00 per hour. Thus, the WCC held that Industrial Indemnity was liable, at the rate of $7.00 per hour, twenty-four hours a day, for the domiciliary care provided by Candice since March 3, 1983, and would remain liable for all future care provided by Candice so long as it was required. Finally, the WCC found that to provide a respite for Candice, a personal care attendant should be appointed to care for Gary on the average of 28.74 hours per week. Candice would care for Gary the remaining 139.26 hours per week.

Following rehearing, the WCC amended somewhat its judgment. Noting that the issue of domiciliary care had not been raised until August 22, 1985--the date of the first hearing--the court held that Industrial Indemnity should not be held liable for payment prior to that date. Industrial

3

Indemnity therefore became liable for this care from the date the issue was first raised, rather than the date of Gary's release from the hospital.

Both parties now appeal. Industrial Indemnity (hereinafter insurer) contests the award of domiciliary care provided by Candice.[1] Gary (claimant) challenges the court's change of the starting date for compensable domiciliary care.

Montana's medical benefit provision under the Workers' Compensation Act is § 39-71-704, MCA, which states in part:

> (1) In addition to the compensation provided by this chapter and as an additional benefit separate and apart from compensation, the following shall be furnished:
>
> (a) After the happening of the injury, the insurer shall furnish, without limitation as to length of time or dollar amount, reasonable services by a physician or surgeon, reasonable hospital services and medicines when needed, and such other treatment as may be approved by the division for the injuries sustained.

In Carlson v. Cain (Mont. 1985), 700 P.2d 607, 614-15, 42 St.Rep. 695, 703-04, this Court affirmed a decision of the WCC which recognized that under this statute domiciliary care provided by a member of an injured employee's family might be compensable as "such other treatment." Today, we reaffirm that decision. We note that this appears to be the majority position, see 2 A. Larson, Workman's Compensation Law, § 61.13(d)(2) (1986), and believe it is correct as a matter of law.

---

[1] Insurer does not contest the appointment of a personal care attendant.

4

In _Carlson_, we quoted with approval a five-step test used by the WCC to determine whether "services provided in the home are compensable."[2] Pursuant to this test, an insurer is liable for domiciliary care if:

> (1) The employer knows of the employee's need for medical services at home resulting from the industrial injury;
>
> (2) the preponderance of credible medical evidence demonstrates that home nursing care is necessary as a result of accident, and describes with a reasonable degree of particularity the nature and extent of duties to be performed by the family members;
>
> (3) the services are performed under the direction of a physician;
>
> (4) the services rendered are of the type normally rendered by trained attendants and beyond the scope of normal household duties; and
>
> (5) there is a means to determine with reasonable certainty the approximate value of the services performed.

_Carlson_, 700 P.2d at 614.

I

Applying these factors, insurer contends that the WCC award of domiciliary care was (1) premature, (2) unsupported by substantial credible evidence, and (3) unreasonable.

---

2    This test is a slightly modified version of the factors set forth in Warren Trucking v. Chandler (Va. 1981), 277 S.E.2d 488, 493.

5

A

Insurer initially argues that the award of domiciliary care was premature. After the issue of domiciliary care had been raised, insurer requested, and ultimately obtained, permission to schedule an independent medical examination at University Hospital in Seattle, Washington. During March-April 1986, the staff at the Department of Rehabilitation Medicine at University Hospital conducted a comprehensive, two-week examination of claimant. The stated purpose of that examination was to obtain a second opinion on the status of claimant in terms of his need for domiciliary care.

The Seattle staff was unable to posit any precise opinion as to the amount of domiciliary care required by claimant. Rather, the Seattle group concluded that before any conclusive determination on this issue could be reached, two recommendations should be implemented:

> (1) Modification in the medicines given claimant; and

> (2) a comprehensive rehabilitation program (to be initiated after the medication modification had been completed).

Insurer accordingly argues that based on the Seattle report, claimant may "improve" to the point where domiciliary care is perhaps even unnecessary. Thus, concludes the argument, any determination of domiciliary care cannot be reached until the Seattle group's recommendations have been attempted. Applying this argument to our Carlson test, insurer highlights the second factor and asserts that the preponderance of the credible medical evidence does not demonstrate the necessity of domiciliary care. Rather, the weight of the evidence demonstrates that such a decision was premature.

6

Balanced against the conclusions of the Seattle staff are the recommendations of Drs. Susan Bertrand and Patricia Webber. Dr. Bertrand is a psychiatrist who specializes in rehabilitative medicine. She practices in Missoula, and has been involved in claimant's case since November 1983. Dr. Webber, also of Missoula, is a psychologist specializing in rehabilitative psychology and has treated claimant since March 1983. Both doctors testified that claimant requires twenty-four hour a day supervision.

Thus, we are faced with conflicting evidence on this issue. We note that since most of the critical evidence presented on this issue was entered by deposition, this Court is considered to be in as good a position as the WCC to judge the weight to be given such testimony. Shupert v. Anaconda Aluminum Co. (Mont. 1985), 696 P.2d 436, 439, 42 St.Rep. 277, 281-82.

Our reading of the record persuades us that the preponderance of the credible medical evidence demonstrates that an award of domiciliary care was warranted in this case. We base this conclusion on several factors.

First, this award was supported by the recommendations of Drs. Bertrand and Webber, the two doctors who have had the longest association with claimant's case. While we recognize the excellence of the Seattle staff,[3] we must also recognize that those doctors examined claimant for only two weeks, albeit intensively, and conducted the examination in a controlled environment.

---

3   In raising this point, we must point out that Dr. Bertrand enjoyed a three-year residency in physical medicine and rehabilitation at University Hospital.

7

By contrast, Drs. Bertrand and Webber have each treated claimant since 1983 and have enjoyed the opportunity to witness claimant adapting to his everyday environment. In short, the record reveals that Drs. Bertrand and Webber have had a much more extensive association with claimant's case.

This fact was acknowledged by the Seattle staff. While the members of the Seattle group may have had reservations about the need for domiciliary care, in the end they deferred to the opinions of Drs. Bertrand and Webber because of the latters' long-term relationship with claimant. Dr. David Shuster, claimant's resident physician on the Seattle staff, admitted that Dr. Bertrand is in a better position to evaluate claimant's condition. Representative of the Seattle staff's conclusions on the necessity of domiciliary care was this statement by Dr. Justice Lehmann, Chairman of the Department of Rehabilitation at University Hospital and attending physician to claimant during claimant's examination, when asked if claimant requires twenty-four hour a day care:

> No, I don't have any opinion because I really don't know. I think it is highly unlikely that he needs twenty-four-hour-a-day care but I don't have any factual basis for that, that I can say he does need it, or he doesn't need it and how much he needs it.

In essence, we find more persuasive the specific recommendations of the doctors who have worked the longest and most closely with the claimant.

Second, even if the Seattle staff's recommendations are implemented, it is disputed whether the necessity of domiciliary care would be abated. Dr. Lehmann testified he could not predict the ultimate effect of the implementation of these recommendations. And while Dr. Vernon Neppe,

8

neuropsychiatrist with the Seattle team, predicted very favorable results, Dr. Bertrand stated that even if successful, these recommendations would probably not change claimant's need for domiciliary care. Dr. Bertrand stated:

> I don't think that those drugs [recommended by the Seattle staff], if they were used and were used successfully, would affect the amount of domiciliary care he requires. After reviewing Dr. Neppe's deposition, as well as his report, those--and having conferred with one of our local psychiatrists who is very familiar with the use of those medications in persons with organic brain syndrome, those [drugs] are for control of his emotional outbursts, and if they were successful, that would make Gary's life more comfortable. However, Gary's other problems would continue to exist and those are problems with abstract reasoning, with short-term memory, because those are not--those don't have anything to do with the emotional system that Propranolol or the Tegretol, Carbamazepine, would affect. It would not affect his need for supervision.

Finally, we must note that any benefit which might result from implementation of the Seattle team's recommendations would be offset, to some degree, by the detrimental effects of continued litigation. As the WCC noted, medical personnel involved with this case have repeatedly stressed that uncertainty, caused in part by this lengthy litigation, produces definite negative effects on claimant.

In sum, for the reasons stated, we find the preponderance of the credible medical evidence demonstrates that domiciliary care is necessary as a result of the accident.

9

B

Insurer next argues that this domiciliary care award is not supported by substantial credible evidence. While acknowledging the injuries suffered by claimant, insurer contends claimant has retained capabilities that belie a need for twenty-four hour a day care.

We cannot accept insurer's argument in full. Dr. Bertrand testified that claimant's physical abilities may make care even more difficult:

> [w]hen you consider how physically active Gary is and how physically well he appears, that he is capable of doing lots of things, but not doing them in a safe or organized fashion. And he really requires someone else providing his overall thinking ability. He needs someone monitoring his level of tiredness, and to do it requires input from another individual to maintain him. Especially, with his emotional ability and his ability of not understanding situations he gets himself into trouble. He really requires looking after and that absorbs the time of another, and in this case, usually Candy. So that even though he's totally impaired, he's even more impaired when that means that he absorbs time and energy from someone else.

While it is agreed that claimant need not be supervised every minute, the record supports the conclusion that during the day someone must constantly be available to him. Stated Dr. Bertrand:

> Not everyone who is supervised every minute needs intervention every minute. But it's the unpredictable nature of the need that demands that there be someone available to meet the need when it arises.

As the WCC correctly noted, it is this constant availability that must be compensated. In Texas Employer Insurance Association v. Choate (Tex.App. 1982), 644 S.W.2d 112, an insurer argued that a claimant's spouse should only be compensated for the actual time she spent caring for her husband. In rejecting that argument, that court stated:

> The more practical problem with the argument is that it ignores the realities of the situation. Mrs. Choate cannot set aside 40 minutes a day, take care of Choate and then go on to other things. She must be available to meet his need during the entire time he is at home and awake. As the company's own witness admitted, a third person hired to do what Mrs. Choate does could not be hired or compensated on the 40 minutes per day basis now advanced by the company; instead such a person would be hired by the day or the week and paid for the time during which he or she is available, not just the time spent actually helping Choate.

Choate, 644 S.W.2d at 116. Accord, Standard Blasting & Coating v. Hayman (Fla.App. 1985), 476 So.2d 1385, 1387; Brown v. Eller Outdoor Advertising Company (Mich. App. 1982), 314 N.W.2d 685, 688. We conclude there is substantial evidence to support the court's finding.

C

Finally, insurer asserts that the $7.00 per hour rate of compensation fixed by the WCC is unsupported by substantial credible evidence. We disagree. This rate was based upon the testimony of Linda Geiger, a care management services nurse who supervises the Care Management Department at Community Hospital in Missoula. In her position, Linda assesses disabled patients and determines the scope and breadth of services required by these patients. She appears

11

to be very well qualified to assess the need for, and cost of, domiciliary care and her testimony provides ample evidence in support of the WCC's decision.


                                II

Finally, claimant contends the lower court's determination that insurer is liable for this domiciliary care not from the date of claimant's release from the hospital but from the date this issue was raised by the WCC is incorrect.

We have had difficulty with this issue. The first step of the Carlson test requires that the employer know of the employee's need for medical services at home. Some courts faced with this issue have imputed a type of constructive notice upon an employer, either because of the severity of the industrial injury or because a representative of the employer had knowledge that domiciliary care would be required. See Balsano v. Fischer Body Division, General Motors Corporation (Mo.App. 1972), 481 S.W.2d 536; Stephens v. Crane Trucking, Inc. (Mo. 1969), 446 S.W.2d 772. While these cases can be distinguished, we agree that an employer may be put on notice of the employee's need for medical services because of the severity of injury. Need for domiciliary care must be supported by medical evidence, and we find it is.

We believe such is the situation in this case. Given the unquestioned severity of the injury, the degree of medical attention claimant required while in the hospital and the permanence of the resulting disabilities, we find that the employer had notice of claimant's need for home nursing services at the date claimant was released from the hospital.


                               12

We accordingly hold that Candice's domiciliary care should be compensated from March 3, 1983.

We remand this case to the WCC for an order consistent with this opinion.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

Mr. Justice L. C. Gulbrandson, dissenting in part:

I concur with all of the foregoing opinion except the extension of the Carlson opinion to now impute constructive notice of the need for medical services at claimant's residence.

I would not make the award for domiciliary care retroactive, but would affirm the Workers' Compensation Court Judge on this issue.

_____
Justice

13